Last matter we'll now take up, I have no idea how to pronounce that, Major Wayne, is that correct? Your Honor, it's Le Jeune. Le Jeune, okay. I was using the past tense. This is the Charter School, not going there again. Good morning. May it please the Court, my name is David J. Birney and I have the pleasure of representing Guardian Le Jeune G and the student TT in this matter and I respectfully request two minutes for rebuttal time. Is some of the 2018 tuition also unpaid for all of the 2018? So that's a good question. Some of the 2015-2016 tuition is unpaid and some of the 2016-2017 tuition is unpaid. Okay, none of the 2017-18? No, because at the point at which the 2017-2018 tuition became an issue, the student was now no longer at Khepera because Khepera only went until 8th grade and was now at the School District of Philadelphia. But the student could no longer get back into the Yale School because there is still this outstanding tuition. But now when you say couldn't get back in because there's outstanding tuition, that's Yale's determination that we won't take you back. That is correct. That is correct. Okay. Which is Yale's right and project decision. It's a business decision. What's that? It's a business decision. It's a business decision. I mean, I don't want to characterize it. You characterize it as a business decision. I mean, the truth of the matter is it's very expensive to educate children with disabilities and the school needs to be able to make some decisions in terms of if it has a scholarship available to provide to a particular student, waiving the money here means that they're not going to be able to provide money in another place. Or they may have to cut services in the form of occupational therapy services or physical therapy services. But the situation here is the reason your client is here is not so much because of the public expense aspect. It's because Yale is imposing this requirement. Is that correct? No, that's not quite exactly correct. I mean, there are two issues as to why we're here. The first issue is that the denial of free and appropriate public education, meaning an education at public expense. You're putting the rabbit in the hat with that. I'm sorry, again? You're assuming something which is not really what we're trying to wrestle with now. That's correct. But if you look at the definition of FAPE, the definition of FAPE under 1401. Before you do that, could you go back? I was partially correct in saying that it's not the lack of public expense. I hear you said there's two things. Yes, and my explanation of the definition of 1401.9, which is the definition of a denial of FAPE, will also answer this. So the definition of FAPE is a free and appropriate public education at public expense. And the purpose of the IDA, when it was passed back in 1975, was to guarantee children who had qualifying disabilities the right to a free and appropriate public education, meaning an education at public expense. Because at that time, too many children with disabilities were being excluded and underserved. Millions of children, one out of five children, were being excluded in their entirety. But the real purpose was to give them the education to take the financial burden off of the parents. And the private schools, that's correct. The private schools and the parents, exactly. Why don't we have that here? I want to, Mr. Finnis, but this is almost kind of like a ball of smoke. Because the student, there's no issue that he did receive, I'll say quality, but currently what was quality education? It was a FAPE at Yale for the time he was there. There's no issue about that. There is no issue that the student received an appropriate education at Yale. Okay. That does not mean that he receives a free and appropriate public education. And there's no issue that the parent has not been burdened with any of the expense. Isn't that correct? There is no contest that the parent has had to pay any out-of-pocket for purposes of the education at Yale, other than now serving as some form of bill collector. The state is representing to you they're not going to go against the parent for any amount of money that might, it's not just a retrospective thing, it's a prospective. The state is saying that they don't expect to try to obtain, or Yale is saying, they're not trying to obtain anything from the parent. Well, there's been no conclusion on that. If you look at the affidavit. But you don't assert that. You don't assert that there is a threat of that. We don't assert that, but we also have not said that Yale has said we're going to forbear from any sort of collection activities. But you're right, we have not said that. Your Honor, getting back to your particular point in terms of what this case is about, it's about two things. The first is, and this also addresses Judge McKee, your point, the guardian is trying to redress and cure the fact that the student did not receive a free and appropriate public education, meaning an education at public expense. We know under the case of SW versus New York City. That goes back in the hat again. You're stating that as though it's an accomplished, established fact. And that's what we're wrestling with. I'm not trying to put the proverbial rabbit in the hat here. Well, all I'm trying to do, I think what I'm really trying to address is more of a standing injury question. I understand at the end of the day, it's going to be the job of the court to determine whether or not there in fact has been a denial of faith. But for purposes of what's conferring standing upon my client, my client is suing over two things. And you may disagree as to whether or not those things rise to viable cause of action. But the point of fact is she's suing for two discrete types of injuries. The first discrete type of injury is that the student was denied a free and appropriate education at public expense. The court may deny that in fact was denied. But that's what she's suing for. And courts around the country have said that that is a valid cause of action. Where a student does not receive an education at public expense, that can confer standing upon a party to sue. That's what happens in the S.W. case. That's the S.W. case. But then we have Spokio decided after S.W. So we can't have, and you in your letter, you cite Spokio and you cite the requirement. But you don't engage with it. I mean, Spokio means there has to be a concrete particularized harm caused by the statutory violation. And I can certainly engage with it because I don't think anything about S.W. varies from the standard that's set forth by Spokio for what constitutes standing. But what concrete particularized harm has been caused by the statutory violation? Okay. So when you look at the statute, the IDA, some statutes, just by virtue of their violation, constitutes a denial of the substantive right that gives rise to injury. It just so happens that the IDA, specifically the purpose of the IDA, is to confer upon individuals, children with disabilities, the right to a free and appropriate public education. Well, it would be one thing if he had been denied the educational benefit, but he hasn't been. So it's more than just simply the educational benefit. That goes back to the definition of faith. If you conflate the definition of faith to simply mean an appropriate education, I agree, we're going to lose. For free. Right. With no burden on the parent. If you conflate the definition of faith to something that's free and something that's appropriate, we're going to lose. I will stand up here and I will say we're going to lose. It also has to be something that doesn't burden, the educational benefit has not burdened the parent. Well, so the language of the statute says that the education needs to be provided at public expense. And there's a reason for that. It's not just some throwaway language. It's not just surplusage, which PD would have you believe, or just idle language that appears in here that, to give it any force, would make this a hypertextual or overly literal read of the statute. The reason why the public expense requirement is important is because the way that the scheme was set up was that the taxpayers, you, me, everybody in this courtroom, pays taxes to the federal governments. And the federal government, in their infinite wisdom, passed a law called the IDA. And as part of that, they said, we will give you, the states, federal money to ensure a free and appropriate public education, meaning an education at public expense. If you take this money, we will give this to you. And oh, by the way, there's a cause of action, not only in the parents, but a cause of action to sue the state if there's a problem here. There is no cause of action, is there? But this court has already said that there's a cause of action. For example, in the Corelli case, the court found that the SEA serves as the backstop or the central point of accountability. For the provision of the education. Because that's essential. For the provision of a free and appropriate public education. For the educational benefit. For the provision of a free and appropriate public education. But there, the education hadn't been provided, right? That is correct. But the definition of the appropriate education is a free, appropriate education at public expense. I know. We do know that. So just simply, so with all due respect, Your Honor, just simply saying the education was provided is not what Congress had in mind. Congress did not have in mind just simply providing the education. Why didn't Congress then say, insert a cause of action against the state if there was a glitch? This court and courts around the country have inferred the right to a cause of action. Where the education hasn't been provided. Well, so for example, to build on your particular point, the Cruelli decision was decided back in 1981. Years and years ago. We are now in a situation where we have the proliferation of charter schools. And these charter schools. You're right. And the amicus, they talk about a loophole. And there is a loophole. Yes. And these charter schools. We're not in the business of filling. That's not a legal issue. But the legal issue is this. When the charter schools have failed. And they're the local educational agency. And they have not provided some sort of education that they're required to provide. The courts below, there is now a consensus among the Eastern District of Pennsylvania. Right. And Judge McHugh has done a lot. Judge McHugh and Charlene are. But that was a reach. That was a reach for him. He had to figure out how to justify that. But he justified it. It's not like he went extra textual to find a justification for that. He looked specifically at the statute. And looked at 1413G. Which requires the state to step in when the LEA doesn't provide appropriate services. And he also looked at 1412A11. Which specifically makes the SEA the guarantor of. Isn't that difficult when you realize that the whole point of the IDEA is the education being provided. And no burden on the parents. So how, when there's, it's something that there has been no education. I mean the education has been provided. And there's no out of pocket to the parents. How do we then create or justify a cause of action? And don't just say because public expense is in the word FAPE. So there's a real burden that takes place on the parents and families and children. When there's no guarantee that there's going to be public funding for these educations. Let me give you some examples. The problem with the argument though is that this is not that case. Well this is the case. The case that you're talking about is what Judge Vandales is I think trying to clarify or clarifying. If the education wasn't provided. And don't forget the adjectives and how you describe the education. But an education that met the child's needs. Absent the funding of it. There's no issue that the education that T.T. received at Yale met his needs. And that's the problem. And now to come along and bring a cause of action against the state agency. And say unless the state agency funds an obligation that Yale itself may not try to pursue. At least against their client. Somehow violates FAPE. There's maybe, it's just maybe there's a bridge there that I'm having trouble crossing. Here's the burden. There's a burden both on this case as well as in future cases. The burden is that when the local educational agency doesn't fund the education at the private school. It creates educational instability for the student. So Yale should sue the PD then. Isn't that the remedy? It's not clear to me at all that Yale has standing to sue PD. Well I don't think UUSA would have sued Yale. Why would Yale's standing be stronger than your standing? Why would Yale's standing be stronger than your standing? Because Yale doesn't have a contract with PD. Who cares? It's quantum merit. It's whatever. They're fulfilling the role that the state is supposed to do at public expense. You're arguing statutory standing. It seems to me the beneficiary of the statutory standing would be the local educational agency Yale. As opposed to the student who received an education. So we could go back and forth regarding whether or not a private school has standing to sue a state educational agency over a contract. They fulfilled the responsibility that the state has to perform under the statute. So I understand what you're saying, but it doesn't strip the students of standing as well in his or her own rights. It does when all the student is contending is that Yale has made a decision not to allow them to come to school because of the money. Because the funding the state will take over to them. But the student faces situations. This is not the only case. A student faces a situation where if there's no public funding that comes into place, the student no longer has, if what you're saying is correct, the student no longer has an avenue to get back into the school. And that in and of itself is a harm. Are you saying that there's but that avenue is because Yale says we don't want to my mind. It would make sense for Yale to take her money, you know, and enroll the student. But it's made the decision we're not going to do that. So, I mean, I don't know how that business decision can can be pegged at a problem with fate. But that's only because the state educational agency and the local educational agency are not funding the education at public expense. Right. According to the definition of fate. It's true. I mean, so in other words, let me let me try to this. Let me let me try it this way. A student, a family, a parent, a student has the has standing to sue where they are alleging something that involves the identification, the evaluation, the placement or the provision of a free and appropriate public education. Right. OK. If this court is to read out the interpretation of fate to exclude this notion of that public expense, well, then you're right. You would be saying that the student doesn't have standing to bring a lawsuit. But the fact of the matter is the court of the Congress and its infinite wisdom decided that the fate definition includes this notion of public expense. And to the extent that T.T.'s education has not been provided at public expense is an injury of a denial of fate. I have a different different question altogether. Why wasn't all this waived? I know you said we wouldn't have known to make this argument, but that's not obvious to me. When the charter school didn't pay, you alleged that there was a violation of the fate obligation. I don't know why we're hearing this for the first time on appeal. Well, so below, we claimed that Keprad denied T.T. fate by by breaching the resolution agreements. And below, we also claims that the state educational agency PDE needs to step in the void and fulfill the terms of the resolution agreements and that it was necessary to secure fate. You'll see that in the joint appendix at page 33. That's part of our complaint at page at paragraph 128. We also argued in our response to the motion for summary judgments. That's the same argument we're making here. Well, you say the PDE is responsible for remedying the denial of fate, including honoring all the terms of the due process order as interpreted by the resolution agreement. So you're not really saying that it has, in fact, denied fate. You're saying it's responsible for. Correct? What we're saying is it's responsible for mediating the denial of fate. We said that below. That's what we're saying here. But here, no, here you're saying it has violated fate. That's what you're saying here. There has been a violation of fate by the PDE because it hasn't been at public expense. That's what you're saying here. You're saying there's a direct cause of action against them for denial of fate. You're not saying they are responsible to remedy T.T.'s denial of fate. I believe we're arguing both. But you didn't below. You did not aver the PDE denied fate. And there's a cause of action against it for denying fate. I think that the distinction that you're drawing between remedying fate versus the denial of fate is a pretty thin distinction. I don't think so. You're saying the charter school violated the right to fate. And then you're saying PDE is responsible for the charter school's denial of fate. Here you're saying you have a cause of action against PDE because it had denied fate because of public lack of concerns. And we're also arguing that PDE has a duty to remediate the denial of fate, similar to what happened in Charlene R., similar to what its obligations are under 1413G, similar to what its obligations are under 1412A11, similar to what its obligations are under 34 CFR 300.2. But to go back to the waiver issue, the third circuit's jurisprudence on waiver is, with all due respect, sometimes not the model of clarity. As if we do. It's not all that clear. It's clear. Aspireus is clear. It's just not as broad as what you might think. Well, so there appear to be different strands in terms of what the third circuit has recognized as allowing some claims to be waived, to be preserved and other claims to be waived. I think you're arguing that the extent of the distinction to be made is so intrinsically intertwined with the argument you did make that realistically speaking and looking at this holistically from the point of view of a litigant, it's there and it's preserved and was properly presented to the district court. That's correct. Well, in your reply brief, you said we didn't do it. We didn't preserve it under Aspireus and we should maybe fit into an exception. But I thought to your credit, you candidly acknowledged if this is going to be decided on Aspireus, we didn't preserve it. Well, I can say this. If the court is going to mandate that we use the term public expense below in order to preserve that claim up here, then yes, under Aspireus, under United States v. Joseph, we're going to concede waiver. If the court, however, takes a more liberal approach and says, no, you don't need to invoke the same talismanic phrase and you can simply say, look, we argued a denial of fate below and now we're still arguing a denial of fate here, then I think it is preserved. I also think that there's ample reason for the court not to invoke the waiver argument because there are certain things at stake. So, for example, when we were originally presented with this case, following the Charlene R. case, we made the argument that in order to be in compliance with what the court had held in Charlene R., that we would be entitled to have the resolution agreement honored by PD if Kepra couldn't honor it. That was our position and that was following on the heels of Charlene R. and we argued that that was necessary to secure T.T. fate. PD came back and said, no, it's within our sole discretion. It is not your right to have it invoked in its entirety. And the court came back with a third position. The court said it's up to the tribunal to evaluate each element of the resolution agreement to determine whether or not that's necessary to secure the student fate. That was something new. And while we don't disagree at this point with the standard that the court invoked, we do disagree with its application. And we never had the opportunity to address its application below because that was essentially what ended the decision. I mean, there were instances where the lower court had asked us for supplemental briefing when it had a question regarding a particular issue and we submitted that supplemental briefing, but it didn't allow us to do that in this case. And moreover, when the court has looked at the issue of whether or not to excuse waiver, the court specifically looks at is the record below sufficiently developed and is there unfair or undue prejudice to the other side? The record below is developed. This is a pure legal issue with stipulated facts. There are no new additional facts that would need to go onto the record in order to make a determination as to whether or not there was a denial of free and appropriate public education. And I assume you would assert that there's a public interest that would be served by considering the issue. That is correct. What's at stake is a student whose father unfortunately was murdered when he was at the age of three, who has a mother who lost custody of him and has been in schools that have traditionally failed to provide him an appropriate education. The only education that we know of that both sides agree have been appropriate is the Yale school. And we know with kids with disabilities and we know with kids who come from inner city neighborhoods and we know that when there's an intersection between the two, when they don't get an appropriate education, the typical direction they go is an adverse outcome. And the only thing that could save this kid from that adverse outcome is a decent education, which is what the Yale school has provided. That's what's at stake. There's no suggestion. It's beyond the issues in this case, but I couldn't help but wonder when I was reading the briefs. What's happening in Roxborough now? Is the kid receiving it? This is not going to be interpreted as any kind of a waiver for anybody who might have in the future. Is there a FAPE in place now, an IDEA that's being properly applied in Roxborough? The child's had an awful time at Roxborough. I know there's not much in the record about this, but there is a declaration. I know they want to go back to Yale, but is it just kind of a preference of private versus public or is it a total failure? It was a total failure at Roxborough. Is there an IEP that needs to be fulfilled right now? So what ended up happening was he ended up going to Roxborough. He was in a series of – he got into a series of fights. It was a complete disaster. He is now at a cyber school to get him out of a situation where he's interacting with other children. Not at public expense. That is at public expense, yes. But he's now missing the – I mean, children need a social component, so he's entirely missing the social component because no school was able to program for his social emotional needs with the exception of Yale. That's why Yale is so critical. Someone is saying that the cyber school where he is currently does not qualify as FAPE. Is that correct? That is correct. That is correct, and that's why we're here. So she would enroll him in Yale at her own expense? Yes, she could. That's the idea, but there is a large tuition burden that is preventing this from happening. Got it. Thank you. Thank you. Thank you. May it please the Court, I'm Claudia Tesoro. I'm from the Attorney General's office, and as you know, I'm representing the Department of Education and its secretary. As we see it, this appeal explicitly in its brief raises a very narrow circumscribed issue, which is whether T.T. received FAPE in seventh grade. Not eighth grade. That's not part of the equation. I'm sorry? Eighth grade is not part of the equation. We're just talking seventh grade. Not part of the question, exactly. So it's a confined and self-limited issue. What was going on in that particular year? But the problem is going to be when we hit on what is FAPE, the financing of it. That's going to be the problem, the public educational component of FAPE. Right. Well, obviously they've tried to make that theory carry the day in this case, and we don't feel that that's correct. Are you arguing standing or the merits? Both. And I was just about to say, especially in view of the Court's letter, although I had already thought of the issue, standing is a threshold question which needs to be addressed first, and it may be dispositive. If you can't get back into Yale given the outstanding tuition obligation, wouldn't that be enough? That's more, it seems to me, than was taken as a sufficiently concrete injury in Spokane. Why wouldn't that be enough? The reality is that Mr. Birney just stood here and said that this child is getting an appropriate education at his current cyber school. In any event, because KEPRA is no longer in use. I thought he said it was missing a very important component of education. Well, then he has the right to seek a whole new administrative process on whether this is an adequate program or not. If it's educationally adequate but not adequate in some other respect, he's got the, he, I shouldn't say he, but he and his guardian have the right to pursue the matter through the IDEA review process, to request a new IEP, to request a reassignment to another location, to ask the LEA, which I believe would be the Philadelphia School District now unless the cyber charter wrinkle changes that. But whoever the LEA is must entertain any challenge to the current educational program. Having said that, we understand that Lejeune Gee believes that Yale was really a good placement for this child, and he thrived there for as long as he could stay there, and she would love for him to go back, apparently. But the law, as concerned as it is about the education of children, provides for a free appropriate public education, not a free appropriate public education at the one and only school that the family would like the kid to go to. FAPE can be delivered in multiple settings depending on the details. As for standing, and the issue of Spokio was touched upon in the questioning, but I thought it would be helpful to remind ourselves of exactly what was said there. You must have Article 3 provides that standing requires a concrete injury even in the context of a statutory violation. And it also says that a plaintiff does not automatically satisfy the injury in fact requirement whenever a statute grants a person a statutory right, and purports to authorize the person to sue. The rules, the standing rules, have been articulated numerous times by this court, by the Supreme Court, in Lujan, for example, as well as Spokio, and many times in between. Isn't there a concrete injury here because he can't get back into Yale? No, because if he gets a free appropriate public education wherever he happens to be, then his rights are satisfied. You're saying he's getting that at the cyber school? Well, I didn't know about the cyber school until a few minutes ago myself, but the point is the lawsuit is about FAPE in 7th grade. He got FAPE in 7th grade is our position. And that's the only... How do you define public education? Well, you got FAPE depending on how we define FAPE. That's what the whole issue boils down to. And whether or not the absence of financial obligation on the part of the parents, even without taking money out of the state's trough, constitutes a public education. That's where the contention is. You're saying he wasn't harmed? They are averring no harm in 7th grade? There is no harm in 7th grade. He got exactly what he wanted. And as a matter of fact, I noticed this in the summary judgment record, and it's not terribly clear, but it may be worth mentioning. Whatever education this young fellow got was not paid in full at Yale, apparently. But the ledger that we have shows that there were payments from TEPRA during 7th grade and in 8th grade. Every so often that covered about half the cost, even better than half the cost of what was on those bills for those two years. In other words, public funds flowed from TEPRA to Yale to pay for T.T.'s education. I acknowledge that there was a shortfall, but whatever education he got at that time was paid for to the extent that it was paid for at all by public funds. But if it hasn't been paid in full, then I don't think it's all that relevant. As was pointed out earlier, Yale is the one who should be concerned about that. It doesn't mean the child did not get the free, appropriate public education he was entitled to if it was bureaucratically disrupted by TEPRA's failure to be able to pay Yale all. But what he got was publicly funded. It wasn't 100% publicly funded, evidently, but it was publicly funded. When you say he got what he was entitled to in 7th grade, it seems like it puts the rabbit in the hat on the other side. He got a free, appropriate education, but it wasn't publicly funded, or at least not entirely. It was at no cost to the parent, which I submit is, as was mentioned earlier, one of the key motivators for establishing this law, that parents should not be burdened. It should be publicly provided. And his parent, or his guardian, rather, did not pay for it, was never asked to pay for it, acknowledges that she didn't and wouldn't and doesn't have to pay for it. But it wasn't publicly provided. It was provided by the generosity of Yale. No, it was provided by the Commonwealth through, the federal government through the Commonwealth to TEPRA, which paid part of it, and a significant part, it appears. We don't know which dollars went to what, but he got his education in 7th grade, and it was publicly funded to that extent. What they're essentially trying to advocate for, it seems, is that when there is a mess-up like this, a business problem, if that's what it is, and unanticipated when the statute was created, possibly, but nevertheless a cash flow problem, that the child should be allowed to, through the mechanisms of the statute, get the state-level agency to provide more money than what it already provided under the formula that it has to operate under in administering the statute. Well, the other thing is, what does public expense mean? If the PDE has paid TEPRA in full, is that a matter of record, whether PDE has, whether the Commonwealth has paid TEPRA in full? For the 7th grade education? I think that that is at least implicit in the record, and I would be glad to look further and report back after. If that has happened, the public expense piece would be satisfied. What I was trying to say, and you have brought another dimension to it by asking that question, is that PDE operates or oversees the special ed all through the Commonwealth, and in so doing, it provided, I'm sure, although I don't have a piece of paper to point to, it provided its grants and so on to the various quarterly agencies. It provided it to qualified school districts and LEAs, including charter schools, and must have, in fact, provided it to TEPRA. If TEPRA had not received what it was supposed to receive, I'm sure there would be awareness of that. TEPRA had its problems, whatever they are, but it wasn't that PDE didn't give it the funding that it was supposed to over a period of time. It wasn't managed well, evidently, but it was that initial payment, that initial payment was not the same as the initial payment. The initial payment has to have been made on each scheduled date or whatever. And once that was done, PDE's obligation to TEPRA was satisfied. Now, is there another obligation that PDE owes to each and every child to make sure that the child gets FAPE? I think that's been oversimplified in the conversation this morning to a certain extent, because even under the Charlene R. line of authority, and in fact, in the part of this case that's no longer at issue, if there is a finding that a kid did not get something that the kid was supposed to get by way of services or educational programming or whatever, and the charter school goes out of existence and can't provide it, but the violation is one which necessitates compensatory education, people are going to have to pay for it. So I think that PDE has stepped in and done that. But that's not what we're talking about in this case. And I don't think it would be a problem for failing charter schools if there could be some way to have the money flow, you know, into a segregated account or something, whereby it would go to the ultimate, go to a situation like Yale. But obviously that's not what happened. And the money goes to TEPRA, and TEPRA spends it on whatever, goes belly up, and then Yale is... Well, when we wrote the brief, it was still in existence. My understanding is that the charter ended June 30th, and that it's not, it was not going to be renewed. It was revoked. And so it's not in existence today. It was before June 30th, then. Why wasn't Lejeune's proper course to sue TEPRA for breach of contract on the resolution agreement? Well, I think they probably couldn't have recovered, not so easily, but I think... But recovery is another question. But the, you remind me of another detail about this record that I don't think has been mentioned, but I think is important. This lawsuit on behalf of TT has, or began, with two separate origins. And partly there had been due process hearings about certain issues and certain compensatory education and where the funds would go and which trust would be used and so on. None of that is related to the dispute we're here about today. The part that we're concerned about is only about the coverage of Yale's obligation, which was agreed to in a resolution, a pre-hearing resolution, under the Alternative Dispute Resolution process. So there was no finding, unlike on some of those other issues, where there was an administrative finding. There was no administrative finding here about the education that was needed. There was a voluntary agreement between the family and TEPRA, who were the only parties at that stage, that yes, TEPRA said, in effect, we can't handle this child's needs completely. We will pay for him to go to private school. And off he went. Actually, he had already started there because this goal was clearly in mind before the resolution session. But TEPRA agreed to pay for Yale to go, and he went. And he was given the education he needed. And TEPRA paid for part of it, as we were discussing. Didn't end up paying all of it. But in seventh grade, there was a contract whereby TEPRA agreed to make that payment, and Lejeune agreed to accept it. And there were sort of like a typical settlement agreement with releases and promises that this is it. It's final, whether it works out or not, we understand. Now, the law does allow you to enforce a resolution agreement in court. But that is not what we're doing here. We're going way beyond the resolution agreement and trying to get PDE to do more than it has already done as the state educational agency. On the technical side of sanding, I guess we've indirectly... Do you know that, in fact, TEPRA was paid? I can find out. I don't know offhand. I know that there's a grant process that comes from federal down to state and state to LEA. But the timing, I'm not sure. It would be an interesting fact if it were a matter of public record that TEPRA actually was paid. And this would be a payment in addition. Would you like me to try and find that out and report back to you? I think it would be helpful, yeah. Then we have the whole picture in front of us. I think it makes it more like Emory, if that's what's happening here. I see my time just ended, so I will have to rest on the brief as far as the merits of the case and the other issues that were covered earlier. I think actually standing goes to the merits as well. They do kind of interact with each other in this case, I think, as far as the injury or not. And I think what we have here is a desire to accomplish what is wanted as a matter of good policy by calling it a statutory cause of action. I think that's really going too far. You're not pressing the waiver issue? I press it insofar as it's in the brief, and I feel it's a valid issue. But since I don't have time to discuss it any further, I feel I must step down. Unless you have questions. But what's your strongest, I mean, we have made exceptions where it is in the public interest, where there is an intertwining, if you will. I mean, if you want to split hairs, you can say the complaint really doesn't aver the PDE, it's self-violated fate. But all the facts are there. It's just a matter of that Judge Beadlestone didn't need to go there because she found that the education was provided, and that's all. What's your strongest reasoning as to why we should find that it's been waived? I think the problem is that the more broadly you express an issue in the case, the less likely you can ever find waiver. Because you can almost say that anything would fall under that gigantic broad umbrella. This is a very, very precise intertwining of issues. It's not a very broad. That's true. The issue of fate is inherently a concern in every or virtually every IDEA case. I'm surprised you might not, in fact, want it to be decided. Of course, you don't know which way. As you can see by looking at how many pages there are in the brief, waiver was a preliminary argument, but we certainly didn't rest our entire case on that, and we still don't. I think, though, that the angle that was, and the one and only angle that really was developed in this brief about the public expense argument had never been argued before. And that sort of undercuts the idea that it was part and parcel of what was raised below. It really didn't come up. Thank you. So I just want to address some things that came up during the course of my friend's presentation. There's a question from Judge Porter regarding why we hadn't sued KEPRA. We did sue KEPRA. That's part and parcel of the underlying case. The fact of the matter is that KEPRA has no resources, was limping along, had not renewed its charter, and closed on June 30th. There was also a question regarding whether or not I represented that the education at the new charter school, cyber charter school, was appropriate. I do not represent that that's an appropriate education under any circumstances. I represent that that is an inappropriate education, so I didn't want that to be mistaken. But it is under a current IEP, is it not? I don't even know if an IEP has been provided. It's under a current LEA. I mean, there's a new LEA. But from our perspective, the education is inappropriate. But you haven't challenged it as inappropriate. That's correct. We have not filed another lawsuit about this. Our resources are somewhat limited. Regarding the injury, I mean, there was some discussion regarding injury and whether or not the failure to provide payment at public expense constitutes some form of injury or whether or not this seems to be sort of a minor part of the definition of fate. There's a recent case that was issued by Judge Kelly in the Eastern District of Pennsylvania. It's Darlene E. v. P.D. and P.D. v. D.E. in which very similar circumstances. The charter school, in this case it was Young Scholar Kenderton that ended up going out of business, placed two students, our students, at the Yale school, again involving the Yale school. And the charter school failed to pay the tuition. And as a result, the Yale school was making noises about terminating the student's education. The Yale school ended up being paid out of the student's trust funds. But then at some point, the Yale school reimbursed those trust funds. And so the question was, because the parents had not incurred any out-of-pocket expenses, whether or not they were entitled to sue P.D., to get P.D. to reimburse for those expenses, or the cost of the education. Again, the argument was solely that the students hadn't been provided a free and appropriate education at public expense. Because P.D. had not paid for it. But there was a complicated factor there. There were hearings, administrative hearings that I think formed the basis for the court's ruling. No, that is not a resolution agreement. That is not correct. So there was an original due process order that originally placed the children there for one year. It was for the 2014-2015 school year. But then for the 2015-2016 school year, the charter school and the private school entered into a private contract that placed the children at the private school. So this was not based on a due process hearing order. This was based solely on an agreement between the private school and the charter school. And what Judge Kelly held was that the failure by the charter school to pay for the expense was an undue burden on the private school. And therefore, it wasn't a public expense. And it ordered P.D. to reimburse the private school for the cost. But I thought that that procedural, that's what makes that case different than this one. He went on for a few paragraphs saying, look, if this had originated out of a resolution agreement, with a release of IDEA claims like we have here, then it would be different. But it's not. It's a direct contract between the charter school and the private school. So there is a direct contract between the private school and the charter school. However, the release of claims was not something, I mean, you're right, there's a resolution agreement here, and there's a mention of a release of claims. But that release of claims has never been raised by P.D. as a particular defense. I mean, both are... A violation of the 2014 hearing officer's decisions. That's only for the 2014-2015 school year. Where the tuition wasn't paid was for the 2015-2016 school year. I mean, I litigated these cases and I'm familiar with the facts of the case. Specifically, what ended up happening was the charter school did not pay for part of the education at the end of the 2015-2016 school year that was based on a private contract between the charter school and the private school. It had nothing to do with the due process hearing order, which was only a placement for the previous school year. And in this case, Judge Kelly specifically found, and this was something that we erased specifically regarding the public expense argument, he specifically found that it was a denial of FAPE because the education at the end of the day that the students received was not at public expense because Yale was forced to bear the burden of the cost. A similar thing happens, honestly, in Ida D. versus P.D. This was another case where two children had been placed by Capra, again Capra, placing two children at an archdiocese school that educated children with Down syndrome. It was Our Lady of Confidence. And what ended up happening was, again, P.D. is receiving money from the federal government, and it is making efforts not to pay and step in when the local educational agency is not providing the funding. This is what happened. Our Lady of Confidence came in and said, look, we're not going to be able to continue educating these children if, in fact, we're not receiving public funding from P.D. And Judge Brody issued an order for back tuition. Back tuition. So in that case, the student had already received the benefits of the education. The parent had it at no cost to themselves. And Judge Brody ordered P.D. to step in and fill the void because otherwise there would be educational instability. That's the harm that I'm trying to highlight. This happens very frequently where you have LEAs who contract with private schools to place students with complex disabilities. And what ends up happening, for some reason, the LEA doesn't end up paying. And then who's left holding the bag? The private school and the students. Don't you think there should be some way that the flow of money from the state should ensure that the Yale-type institution is not at risk for the financial fragility of the charter school? Yes, of course I think that. That's what 1413G and 1412A11 are designed to protect. That's the role of the SEA in terms of providing the backstop that exists in case the LEA doesn't provide that fund. And you had asked the question, well, did P.D. actually provide the money to the LEA? And did the LEA just squander the funds? And probably yes. Well, I don't think that happens. It's not a record. I don't think it happens. I think what ended up happening was P.D. ended up withholding the money because it knew that KEPRA was not providing FATE to a series of students. So all of this is beyond the record? This is beyond the record. Mr. Soros is very conscious of her clock. You've been running for a while and she was very good about self-imposing a time limit. Understood. So then this is the last thing that I want to say regarding that point. Even if P.D. had provided the money to KEPRA and KEPRA had squandered the money, it still doesn't mean that the students would have received a free and appropriate public education because they would not have received their education at Yale at public expense. It makes no difference. Are you saying that P.D. could have paid 100 percent of the money to KEPRA and, oh, by virtue of KEPRA being insolvent, Yale didn't get paid so P.D.E. has to pay Yale as well? That's what the statute says. Oh, my goodness. That is what the statute says. And if it's in the infinite wisdom of the state to create these charter schools and make them local educational agencies and provide them funding in... This needs to go to Harrisburg or somewhere. I understand. All you have right now is the statute. And I'm saying to you that under the statute and the jurisprudence of this court as well as courts around the country, it has traditionally been the role of the SEA to step in and serve as the backstop to guarantee FAPE when the local educational agency fails to do it. Thank you.